# EXHIBIT A

Fulton County Superior Court
***EFILED***TV
Date: 2/12/2026 6:18 PM
Che Alexander, Clerk

**IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA**

STIMLABS LLC,                          )
    Plaintiff,                          )
                     )
                     )
    v.                          )    CIVIL ACTION NO. 26CV002253 _____
                     )    JURY TRIAL DEMANDED
MERAKRIS THERAPEUTICS              )
INC.,                          )
    Defendant.                          )
                     )
                     )

**COMPLAINT**

COMES NOW Plaintiff Stimlabs LLC ("**StimLabs**" or "**Plaintiff**"), and files this Complaint against Defendant Merakris Therapeutics Inc. ("**Merakris**" or "**Defendant**") showing the Court the following:

**NATURE OF ACTION**

1. This action arises from a business relationship through which StimLabs, in 2025, distributed human-tissue medical products called "skin-substitutes" manufactured by Merakris.

2. The parties had entered an Exclusive Distribution Agreement (the "**Distribution Agreement**") pursuant to which StimLabs purchased Products and, in turn, sold those Products to physicians and other medical providers.

3. In July 2025, the Centers for Medicare and Medicaid Services ("**CMS**") proposed a change in reimbursement that would radically reduce the rates at which

1

government payors would reimburse insureds for Merakris' products (the "**Monumental Rate Change**").  This shift undermined the fundamental cornerstone of the parties' relationship and reflected a contingency that the parties agreed provided circumstances where neither of them would be liable for the delay or failure of performances under the Distribution Agreement.

4.      After the CMS announcement, Merakris departed from the parties' original agreement, requesting StimLabs pay with different payment terms and seeking to re-establish the parties' relationship as a consignment one.  In addition, Merakris breached StimLabs' exclusivity rights under the Distribution Agreement and began offering Products for sale itself or through others in StimLabs' exclusive territory, the United States.  This further reduced StimLabs' ability to market the Products in an environment already made more difficult by the Monumental Rate Change.

5.      Merakris' conduct constitutes breaches of its obligations under the Distribution Agreement, the implied obligation of good faith and fair dealing, and other promises and representations Merakris had made.  These actions give rise to claims by StimLabs for substantial damages as well as StimLabs' rights to invoke legal and equitable remedies.

6.      As of the filing of this Complaint, Merakris has failed to acknowledge its actions which not only have substantially harmed StimLabs but also have impacted any reciprocal performance obligations of StimLabs.  Merakris continues to demand millions of dollars in payments from StimLabs to which it is not entitled.

7.      For these reasons, StimLabs has been compelled to invoke this Court's authority to recover damages arising from Merakris' conduct and otherwise resolve the parties' dispute.

## PARTIES, JURISDICTION, AND VENUE

8.      StimLabs is a Georgia limited liability company with its principal place of business in Roswell, Georgia.

9.      Merakris is a Delaware corporation with its principal place of business in Research Triangle Park, North Carolina.

10.      Merakris is subject to personal jurisdiction in this Court pursuant to O.C.G.A. § 9-10-91(1) and (3) and consistent with principles of due process because Merakris has purposefully availed itself of the benefit of doing business in the State of Georgia by entering a business relationship with StimLabs and shipping products into Georgia for distribution by StimLabs.

11.      Venue is proper in this County pursuant to O.C.G.A § 9-10-93. Specifically, Defendant transacted a substantial amount of business in this County.

## FACTUAL ALLEGATIONS

**A.      The Parties Enter Into the Distribution Agreement**

12.      Merakris and StimLabs are businesses engaged in developing human-tissue medical products called "skin substitutes" for the care of wounds and other therapeutic purposes.

13.      In February 2025, the parties entered the Distribution Agreement through which Merakris appointed StimLabs as the exclusive distributor in the

3

United States of Merakris' Dermacyte® Amniotic Wound Matrix products ("**AM Products**") and its Dermacyte® AC Matrix Amniotic Membrane products ("**AC Products**," collectively with AM Products, the "**Products**").

14.    The Products are skin substitutes used for the care of wounds and other therapeutic purposes.

15.    By appointing StimLabs as its exclusive distributor, Merakris agreed that it would not, and it would not allow others besides StimLabs, to distribute the Products anywhere in the United States.

16.    At the time the parties entered the Distribution Agreement, CMS set the reimbursement rate (the "**Reimbursement Rate**") for skin substitutes, including the Products, based on a calculation of a product's average sales price ("**ASP**") for the previous two quarters.

17.    The Reimbursement Rate was the foundation upon which the parties developed pricing for the Products, set sales projections and purchase commitments for the Products, and defined their contractual relationship.

18.    At the time the parties entered the Distribution Agreement, an ASP had not been established for the AM Products or the AC Products.  The parties expected that ASP for the AM Products would be set by CMS for purposes of computing its Reimbursement Rate in the second quarter of 2025.  Neither party believed the AC Products would receive ASP in the second quarter of 2025, and there was uncertainty if they would ever receive ASP.

4

19.     Both AM and AC Products received an ASP in the second quarter, but due to CMS' reimbursement policy, ASP for the third and fourth quarters of 2025 were not known and would not be known until later in the year.

20.     The parties included in the Distribution Agreement terms related to the forecast of projected sales of the Products and a concept of Minimum Purchase Commitments ("**MPCs**") that set anticipated purchases of Products by StimLabs. MPCs were based on projected sales at the time the parties entered the Distribution Agreement and were inextricably intertwined with the reimbursement framework.

21.     StimLabs had an understanding that the MPCs stated in the Distribution Agreement would apply to the second quarter of 2025 but would be reassessed for the third and fourth quarter of 2025 based on market conditions and updated sales projections informed, in part, by changes in ASP.

**B.     CMS Makes a Monumental Change in the Reimbursement Rate for the Products**

22.     In July 2025, CMS proposed the Monumental Rate Change.  The Monumental Rate Change, if implemented, would radically change the manner in which CMS calculated the Reimbursement Rate for skin substitutes, including the Products.

23.     Specifically, CMS announced that, effective January 1, 2026, CMS would stop treating the Products as ones reimbursed under Medicare Part B with the Reimbursement Rate calculated based on ASP.

5

24.    In the Monumental Rate Change, CMS proposed that the Reimbursement Rate for the Products would be based on a physician fee schedule rather than ASP.

25.    This meant that reimbursement for the AC Products would precipitously drop from approximately $2,952 per square centimeter to approximately $127 per square centimeter, a reduction of approximately 96%. Reimbursement for the AM Products would similarly be impacted by the Monumental Rate Change.

26.    Many in the industry believed that the Monumental Rate Change would so thoroughly disrupt the marketplace and undermine access to important medical treatments that it would never be adopted and CMS would likely revisit its proposal before promulgating a final rule.

27.    Nonetheless, the effect of CMS' proposal for the Monumental Rate Change immediately impacted the ability to market and sell the Products. Physicians and other health care providers, knowing that government payors would not reimburse insureds for the costs of the Products, began reducing the use of Products.

**C.    Merakris Abandons the Distributorship Agreement and Breaches Exclusivity Obligations**

28.    In the wake of CMS' announcement, Merakris took several steps which repudiated and abandoned the Distribution Agreement.

29.     For instance, Merakris requested that the parties redefine their relationship as a consignment relationship—a categorically different arrangement than the distributor relationship then in place.

30.     To these ends, in the third quarter of 2025, Merakris asked StimLabs to present purchase orders with proposed payment periods that were different from how they had been previously agreed to under the Distribution Agreement. Previously, StimLabs would issue purchase orders for requested Products and Merakris would invoice StimLabs for those Products.

31.     Merakris asked that instead, payment terms for third and fourth-quarter orders be revised so that invoices would not be issued for the third and fourth quarters until the fourth quarter of 2025 and first quarter of 2026, respectively.

32.     At the start of the fourth quarter of 2025, Merakris contended that more than $1 million in purchases by StimLabs did not count toward MPCs in the Distribution Agreement because, it was Merakris' view, that the parties had entered a consignment arrangement.

33.     In addition, Merakris began ignoring its obligations to ensure StimLabs was the exclusive distributor of the Products.  It began offering the Products for sale itself, or through other distributors, to customers in the United States, notwithstanding its obligations to StimLabs.

34.     By doing so, Merakris breached a material obligation under the Distribution Agreement.

7

35.     In an exclusive distributorship, a key component of the value of the distributorship to the distributor is exclusivity.  If, having negotiated exclusivity, the manufacturer competes against the distributor, the distributor is substantially harmed because it is now competing against its manufacturer.  The distributor loses profits from potential sales, sells fewer products, and when it sells them, sells them at lower prices than it might as an exclusive distributor.  Exclusivity is the fundamental obligation of a seller that justifies any price or purchase commitment by the distributor.

36.     Merakris' breach of its exclusivity obligations caused substantial damages to StimLabs.

37.     In approximately October 2025, Merakris' Commercial Sales Manager, Tony Watson, acknowledged to StimLabs that Merakris had breached StimLabs' exclusivity rights.  In fact, Mr. Watson apologized to StimLabs for Merakris' wrongful and unlawful actions.

38.     Also in October 2025, Merakris presented StimLabs with an invoice that contrived a position that $1.8 million in third-quarter purchases were consignment purchases that did not count toward Distribution Agreement MPCs. On that basis, Merakris claimed StimLabs was in default and demanded a $1.8 million penalty.

39.     In later months, Merakris tried to develop other grounds to claim that StimLabs had not met third-quarter MPCs to create a justification for Merakris' breach of exclusivity.

8

40.     In December 2025, Merakris developed a theory that, even though the parties had agreed StimLabs was the exclusive distributor of AM and AC Product brands, their agreement only applied to product sizes existing when the Distribution Agreement was entered.  Merakris asserted that because StimLabs purchased a new-sized AC Product beginning in the third quarter, those purchases did not count toward MPCs.

41.     Under this theory, Merakris similarly revoked credit for millions of dollars of purchases ($1.9 million) in order to claim that StimLabs was in default prior to Merakris breaching its exclusivity obligations.  On that basis, Merakris transmitted invoices asserting StimLabs did not meet MPCs and demanding $1.9 million in penalties.

42.     In January 2026, Merakris revised this position.  It continued to claim that new-sized AC Product purchases did not count toward MPCs, but revoked credit for approximately $815,000, asserted StimLabs did not meet MPCs and demanded $815,000 in penalties.

**D.     CMS Issues a Final Rule Adopting the Monumental Rate Change**

43.     On October 31, 2025, CMS issued a final rule stating that it would implement the Monumental Rate Change effective January 1, 2026.

44.     Businesses in the skin substitute industry were stunned that CMS followed through on the Monumental Rate Change given the disruptive and chaotic impact it would have on the marketplace.

9

45.    To the extent that the parties had remaining obligations to one another under the Distribution Agreement, the Monumental Rate Change undermined the fundamental premises of the parties' business relationship.

46.    There was no reasonable basis to conclude, for instance, that in the face of the Monumental Rate Change, sales of the Products could ever reach MPCs stated in the Distribution Agreement when it was entered in February 2025.

47.    The parties, however, had agreed how their rights and obligations under the Distribution Agreement would be impacted by a contingency like the Monumental Rate Change.

48.    Section 21 of the Distribution Agreement provides:

> **21. Force Majeure.**  Neither party shall be held responsible for any delay or failure in performance of any part of this Agreement to the extent such delay or failure is caused by fire, flood, strike, pandemic or public health emergency, civil, governmental or military authority, or act of God.

49.    The Monumental Rate Change reflected an action by a "governmental authority" that caused a "delay or failure in performance" for which StimLabs, if it had any further obligations of performance, under Section 21, would not be held responsible.

### E.    Merakris Fails to Withdraw Its Baseless Demands

50.    Despite its conduct above, Merakris has continued to make baseless demands of StimLabs.

51.    Most recently, Merakris has tried to claim that StimLabs was obligated to meet MPCs in the fourth quarter and, having not done so, must pay more than $3 million in penalties.

10

52. This and other demands by Merakris fail to acknowledge:

    a. Merakris' contentions that StimLabs failed to meet third-quarter MPCs have been made in bad faith.

    b. Merakris breached its exclusivity obligations to StimLabs, causing StimLabs extensive damages.

    c. The consequence of Merakris having breached its exclusivity obligations to StimLabs is that Merakris can no longer demand that StimLabs pay a negotiated price for Products or demand that StimLabs meet any purchase requirements.

    d. To the extent that StimLabs' performance obligations were not already discharged by Merakris' conduct, they have been excused by virtue of the Monumental Rate Change and Section 21 of the Distribution Agreement.

53. Merakris' refusal to accept the consequences of the above have created an untenable situation for StimLabs.  If StimLabs were to acquiesce to Merakris' baseless demands, StimLabs would suffer significant and irreparable harm.

54. For these reasons, StimLabs has come to this Court to seek to recover damages arising from Merakris' wrongful conduct and for the Court to otherwise resolve this dispute.

## CAUSES OF ACTION

### COUNT ONE: BREACH OF CONTRACT – EXCLUSIVITY

55.     StimLabs realleges and incorporates by reference paragraphs 1-54 as if fully set forth herein.

56.     StimLabs and Merakris were parties to the Distribution Agreement.

57.     Under the Distribution Agreement, Merakris granted StimLabs the exclusive right to distribute all AM and AC Products in the United States.

58.     Merakris breached the Distribution Agreement by distributing the Products itself or allowing other distributors to do so within StimLabs' territory, the United States.

59.     Merakris' breach of the Distribution Agreement constitutes a breach of a material obligation under the Distribution Agreement.

60.     Merakris' breach of the Distribution Agreement has caused StimLabs damages in an amount to be determined at trial.

61.     StimLabs is entitled to seek damages and other remedies to which it is entitled under law arising from Merakris' breach.

### COUNT TWO: BREACH OF CONTRACT – COVENANT OF GOOD FAITH AND FAIR DEALING

62.     StimLabs realleges and incorporates by reference paragraphs 1-54 as if fully set forth herein.

63.     StimLabs and Merakris were parties to the Distribution Agreement.

64.     Merakris, among other actions, breached the obligation of good faith and fair dealing implied in the parties' Distribution Agreement by:

12

a.  Contending in bad faith, on multiple bases, that StimLabs did not meet MPCs for the third quarter of 2025.

b.  Breaching the exclusivity obligations of the Distribution Agreement.

c.  Contending in bad faith that Merakris' breaches of the exclusivity obligations of the Distribution Agreement were justified.

d.  Seeking millions of dollars in penalties claiming that StimLabs failed to meet MPCs, even though Merakris lacks any legal basis to seek such penalties.

65.  Merakris' breach of the covenant of good faith and fair dealing constitutes a material breach of Merakris' obligations to StimLabs.

66.  Merakris' breach of the covenant of good faith and fair dealing has caused StimLabs damages in an amount to be determined at trial.

67.  StimLabs is entitled to seek damages and other remedies to which it is entitled under law or in equity arising from Merakris' breach of the covenant of good faith and fair dealing.

### COUNT THREE: PROMISSORY ESTOPPEL

68.  StimLabs realleges and incorporates by reference paragraphs 1-54 as if fully set forth herein.

69.     Merakris promised StimLabs that it would reassess the MPCs stated in the Distribution Agreement for the third and fourth quarters of 2025 based on market conditions.

70.     Merakris promised that StimLabs' purchase of Products of the brands described in the Distribution Agreement counted toward any purchase requirements.

71.     Merakris refused to honor the foregoing promises.

72.     Merakris foresaw that StimLabs would rely on the foregoing promises when purchasing Products from Merakris.

73.     StimLabs reasonably relied on the foregoing promises.

74.     StimLabs suffered damages due to its reliance on the foregoing promises.

## COUNT FOUR: DECLARATORY JUDGMENT – FORCE MAJEURE

75.     StimLabs realleges and incorporates by reference paragraphs 1-54 as if fully set forth herein.

76.     This case involves an actual controversy of a justiciable nature between the parties concerning their respective rights and legal relations to one another.

77.     Section 21 of the Distribution Agreement provides:

**21. Force Majeure.** Neither party shall be held responsible for any delay or failure in performance of any part of this Agreement to the extent such delay or failure is caused by fire, flood, strike, pandemic or public health emergency, civil, governmental or military authority, or act of God.

14

78. In the second quarter of 2025, CMS first proposed and, in the fourth quarter of 2025, CMS determined that it would alter the Reimbursement Rate from the ASP-based rate to a rate based on a physician fee schedule. This change in Reimbursement Rate is described above as the Monumental Rate Change.

79. CMS' determination to implement the Monumental Rate Change resulted in a precipitous drop in the Reimbursement Rate for the Products which fundamentally disrupted the foundation of the parties' contractual relationship.

80. The Monumental Rate Change reflects an action by a "governmental authority" provided in the Distribution Agreement that causes a delay or failure in performance.

81. The Monumental Rate Change caused delays and/or failures of StimLabs' performance.

82. StimLabs is in need of intervention by the Court to settle and afford relief from uncertainty and insecurity with respect to its rights, status, and legal relations, and the ends of justice require that the declaration be made.

83. Accordingly, StimLabs seeks a declaratory judgment by the Court, pursuant to O.C.G.A. §§ 9-4-1 *et seq.*, that to the extent that StimLabs' obligations under the Distribution Agreement had not already been excused by Merakris' conduct, StimLabs shall not be held responsible for any delay or failure in performance under the Distribution Agreement for the third and fourth quarters of 2025.

## COUNT FIVE: DECLARATORY JUDGMENT – ABANDONMENT OF CONTRACT (ALTERNATIVE)

84. StimLabs realleges and incorporates by reference paragraphs 1-54 as if fully set forth herein.

85. This case involves an actual controversy of a justiciable nature between the parties concerning their respective rights and legal relations to one another.

86. The parties were parties to the Distribution Agreement.

87. In the third quarter of 2025, Merakris took steps reflecting the abandonment of the Distribution Agreement.  Such conduct included, among other things:

    a. Treating sales of Products as consignment sales, not distribution sales.

    b. Changing the payment terms for the Products to depart from those based on the course of performance of the Distribution Agreement.

    c. Offering for sale, or authorizing others to sell, Products in StimLabs' exclusive territory, the United States, in violation of the exclusive distribution rights that Merakris granted to StimLabs.

88. The foregoing reflects the abandonment of the obligations of the Distribution Agreement.

16

89.     StimLabs is in need of intervention by the Court to settle and afford relief from uncertainty and insecurity with respect to its rights, status, and legal relations, and the ends of justice require that the declaration be made.

90.     Accordingly, as an alternative to other claims asserted herein, StimLabs seeks a declaratory judgment by the Court, pursuant to O.C.G.A. §§ 9-4-1 *et seq.*, that the parties abandoned the Distribution Agreement and, therefore, any further obligations to one another are not arising from the Distribution Agreement or any other contract between them.

**COUNT SIX: ATTORNEYS' FEES AND EXPENSES OF LITIGATION**

91.     StimLabs realleges and incorporates by reference paragraphs 1-90 as if fully set forth herein.

92.     As described herein, Merakris has and continues to act in bad faith, advancing baseless contentions to excuse its own breach of its obligations, and demanding millions of dollars to which it is not entitled.  By doing so, StimLabs has incurred and continues to incur unnecessary trouble, costs, and expenses.

93.     Merakris has rejected StimLabs' attempts to address these issues, instead persisting in making payment demands which continue to fail to acknowledge that Merakris:

a.     Has contended in bad faith, on multiple bases, that StimLabs did not meet MPCs for the third quarter of 2025.

b.     Has breached the exclusivity obligations of the Distribution Agreement.

17

     c.     Has contended in bad faith that Merakris' breach of the exclusivity obligations of the Distribution Agreement were justified.

     d.     Has sought millions of dollars in penalties claiming that StimLabs failed to meet MPCs, even though Merakris lacks any legal basis to do so.

94.     Therefore, pursuant to O.C.G.A § 13-6-11, StimLabs is entitled to recover its expenses of litigation, including, without limitation, its reasonable attorneys' fees, from Merakris.

**PRAYER**

WHEREFORE, Plaintiff respectfully requests:

(A)     That summons and process issue and be served upon Defendant;

(B)     For a trial by jury comprised of twelve (12) persons;

(C)     For a judgment in favor of Plaintiff and against Defendant on all claims;

(D)     That Plaintiff be awarded all damages allowed by law;

(E)     That the Court enter a judgment declaring that the Monumental Rate Change constituted government action under Section 21 of the Distribution Agreement and StimLabs shall not be liable for performance obligations under the Distribution Agreement;

(F)     That the Court, in the alternative to other relief requested, enter a judgment declaring that the Distribution Agreement was abandoned;

18

(G)    That Plaintiff be awarded attorneys' fees and expenses of litigation, as

provided by O.C.G.A. § 13-6-11; and

(H)    That Plaintiff have any other relief as this Court deems just and

proper.

Dated:        February 12, 2026.

**GRIFFIN DURHAM TANNER & CLARKSON LLC**

/s/ J. Thomas Clarkson
J. Thomas Clarkson
Georgia State Bar No. 656069
Tclarkson@griffindurham.com
75 14th Street NE, Suite 2250
Atlanta, Georgia 30309
(404) 891-9152

**ROBINSON BRADSHAW & HINSON, P.A.**
(*Pro Hac Vice* Admission Applications Forthcoming)
Jonathan C. Krisko
N.C. State Bar No. 28625
Jkrisko@rbh.com

Steven G. Joseph
N.C. State Bar No. 59863
Sjoseph@rbh.com
600 South Tryon Street
Suite 2300
Charlotte, North Carolina 28202
(704) 377-8314

19

Kelley M. Storey
N.C. State Bar No. 56607
Kstorey@rbh.com
1450 Raleigh Road, Suite 100
Chapel Hill, North Carolina 27517
(919) 328-8825

***Attorneys for Plaintiff***

Fulton County Superior Court
***EFILED***TV
Date: 2/12/2026 6:18 PM
Che Alexander, Clerk

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| STIMLABS LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>MERAKRIS THERAPEUTICS INC.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO. 26CV002253 _____

JURY TRIAL DEMANDED

## CERTIFICATION UNDER RULE 3.2

Pursuant to Rule 3.2 of the Georgia Uniform Superior Court Rules, I certify that this petition-pleading does not involve substantially the same parties, substantially the same subject matter, or substantially the same factual issues which would require the petition-pleading to be specifically assigned to the Judge to whom the original action was assigned.

Respectfully submitted on February 12, 2026.

GRIFFIN DURHAM TANNER & CLARKSON, LLC

/s/ *J. Thomas Clarkson*
J. Thomas Clarkson
Georgia Bar No. 656069
tclarkson@griffindurham.com
75 14th Street NE, Suite 2250
Atlanta, GA 30309
Ph: 404-891-9152

*Counsel for Plaintiff*

## General Civil and Domestic Relations Case Filing Information Form

Fulton County Superior Court
***EFILED***TV
Date: 2/12/2026 6:18 PM
Che Alexander, Clerk

☑ **Superior or** ☐ **State Court of** _Fulton_____ **County**

| **For Clerk Use Only** | |
|---|---|
| **Date Filed** _2/12/2026_____ <br> **MM-DD-YYYY** | **Case Number** _26CV002253_____ |

**Plaintiff(s)**
Stimlabs LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Defendant(s)**
Merakris Therapeutics, Inc.

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Plaintiff's Attorney** _J. Thomas Clarkson_____  **Bar Number** _656069_____  **Self-Represented** ☐

### Check One Case Type in One Box

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☑ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Dissolution/Divorce/Separate Maintenance
- ☐ Family Violence Petition
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

**Post-Judgment – Check One Case Type**
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Modification
- ☐ Other/Administrative

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____ _____
        **Case Number**                        **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is an interpreter needed in this case? If so, provide the language(s) required. _____
                                                                                                    **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.
_____
_____

Version 1.1.18

Fulton County Superior Court
***EFILED***TV
Date: 2/12/2026 6:18 PM
Che Alexander, Clerk



# IN THE SUPERIOR COURT OF FULTON COUNTY

## STATE OF GEORGIA

185 Shirley Clarke Franklin Blvd., Suite J1-G200, Atlanta, Georgia, 30303

**Stimlabs LLC**                                      **Civil Action No.** __26CV002253__

**Plaintiff**

**v.**

**Merakris Therapeutics Inc.**

**Defendant**

## SUMMONS

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to electronically file with the Clerk of said Court via eFileGA at https://efilega.tylertech.cloud/OfsEfsp/ui/landing or via PeachCourt at https://peachcourt.com (unless you are exempt from filing electronically) and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

> J. Thomas Clarkson
> Griffin Durham Tanner & Clarkson LLC
> 75 14th Street NE, Suite 2250
> Atlanta, GA 30309
> tclarkson@griffindurham.com

an answer to the complaint  which is hereby served on you.  You must make your answer within 30 days after service of this summons upon you.  This time excludes the day of service.  If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

This 12th  day of February, 2026.

Honorable Ché Alexander,
Clerk of Superior Court

By _____
Deputy Clerk

[Attach addendum sheet for additional parties, if needed.  You must make a notation on this sheet if used.]

SC-1
Rev. 1/25